623 F.2d 602
 Charles S. SOLOMON and Laura T. Solomon, Plaintiffs-Appellees,
v.
PENDARIES PROPERTIES, INC., a New Mexico Corporation, and
Ten RociadaCorporation, a New Mexico Corporation,
Defendants-Appellants.*
No. 78-1282.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 30, 1979.
Decided Aug. 11, 1980.
Rehearing Denied Sept. 22, 1980.
 
 Edwin Freston, Los Angeles, Cal. (Don M. Pearson and Robert P. Beckham, of Argue, Freston & Myers, Los Angeles, Cal., and Michael L. Gregory, Las Vegas, N. M., with him on brief), for defendants-appellants.
 F. Joel Roth of Solomon Roth & Vanamberg, Santa Fe, N. M., for plaintiffs-appellees.
 Before SETH, Chief Judge, and McKAY and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Charles S. and Laura T. Solomon sued Pendaries Properties, Incorporated (PPI) and Ten Rociada Corporation for rescission of a contract they had entered into for the purchase of land in a New Mexico development, Pendaries Village. After a nonjury trial, the district court granted rescission to the Solomons, awarded them the $11,981 principal and interest they had paid for the land and gave them $5,000 punitive damages. Jurisdiction is based on the Interstate Land Sales Full Disclosure Act (Land Sales Act), 15 U.S.C. § 1701 et seq. and 28 U.S.C. § 1331(a).
 
 
 2
 The Solomons' dissatisfaction with their purchase of a lot in Pendaries Village centers on their claim that developer PPI failed to construct all the amenities it had represented would be a part of the completed development. They sought rescission based on the allegation that the lot was purchased under fraud or intentional misrepresentation on the part of PPI. Defendants contend that the evidence was insufficient to establish fraud or misrepresentation under either the Land Sales Act or the common law of New Mexico. We agree, and therefore do not deal with defendants' other contentions of error.
 
 
 3
 The Solomons purchased lot 5 in Unit 4-2 of Pendaries Village in October 1973. The next month they purchased four additional lots to hold for investment. The purchase price on the lots was to be paid to PPI in monthly installments pursuant to land sale contracts executed by the parties. In 1975 Solomon became concerned that not all of the promised facilities would be completed and so began agitating PPI to transfer his equity in the four investment lots to lot 5, which would pay off that lot. PPI finally agreed to the transfer although in doing so it gave up the right to collect $20,000 from the Solomons. PPI sent the Solomons the deed to lot 5 in May 1976. In October 1976 the Solomons became convinced the project would never be completed as promised and so filed this lawsuit. A month later Ten Rociada Corporation, a subsidiary of the primary lender on the Pendaries Village project, took over PPI by deed in lieu of foreclosure. Ten Rociada continued to operate the project, but apparently did not plan any additional construction.
 
 
 4
 At the time of Solomons' purchase Pendaries Village had existing amenities of a lodge, a swimming pool with cabana, and a twelve-hole golf course. The Solomons received from PPI a property report, as required by the Land Sales Act, and various other oral and written communications describing the improvements the completed project would have. The district court found that through these PPI had represented it would build the following items by December 1975: Ten new lakes and ponds, an additional nine-hole golf course, eight tennis courts, golf course club house and pro shop, front entrance beautification, security system, saddle club area, main lodge with additional recreational facilities including a second swimming pool, campgrounds, complete water system, and streets built to certain specifications. The court then found that by the end of 1975 PPI had constructed the following: Two or three ponds, the nine-hole golf course, two tennis courts, golf pro shop, front entrance beautification, partial security system, some horse-riding facilities, partial water system, and streets not completely built to specifications.
 
 
 5
 Charles Solomon was plaintiffs' only witness at trial. He testified that there was much activity at first after the purchase, but the developing slowed dramatically in 1975, a period during which, he acknowledged, the whole nation was in a depressed economic state. At that time a sales representative from PPI told him that the recession was the cause of the slowed development, but that construction would begin again, although at a much slower pace. Between early 1975 and May of that year, some more facilities were constructed.
 
 
 6
 The trial judge found, and the evidence supports this finding, that PPI represented it would build certain amenities which were not in fact built. The judge also found that failure to provide the promised facilities was a material misrepresentation and fraud upon which the plaintiffs relied in purchasing lot 5.[1] The judge did not find, however, that PPI did not intend at the time of sale to build all the described amenities. Instead, at the close of the trial the judge made the following statement: "Now, there isn't any question in my mind but what there is fraud, but there was it wasn't intentional fraud. They were promised to do certain things if you bought the property and they didn't do those things . . . . It appears to the Court that the defendant hadn't done what it was supposed to do, what it promised to do."
 
 
 7
 Our review of the record reveals no evidence from which to infer a fraudulent intent at the time of sale. Many of the amenities were built at a cost of more than one million dollars. According to Solomon's testimony there was active progress toward completing the facilities until the recession of 1975. That PPI was experiencing financial problems at that time is demonstrated by the primary lender's foreclosure in 1976. The evidence indicates that the failure to complete the facilities was due to economic problems incurred several years after the Solomons' purchase.
 
 
 8
 The following testimony by Solomon makes it clear that he never thought PPI intended to deceive him at the time of sale:
 
 
 9
 A. (Solomon) (M)aybe their (PPI) intent was to put them in, but they never have. That is my idea of false. I don't think they lied to me when they gave me the property report or anything else. I think the time had come when they just didn't do anything.
 
 
 10
 (Tr.97).
 
 
 11
 Q. It's a fraud, you claim, for the misstatements in the property report?
 
 
 12
 A. That turned out to be misstatements, yes.
 
 
 13
 Q. That's the problem you complain of?
 
 
 14
 A. That's right. I don't believe anyone intentionally lied to me on the surface.
 
 
 15
 (Tr.106).
 
 
 16
 Therefore, we must decide whether mere subsequent nonperformance of promises is sufficient to support a cause of action under the Land Sales Act, as it existed at the time of this transaction, or under the common law tort of fraud or misrepresentation.
 
 
 17
 The Land Sales Act, 15 U.S.C. § 1709, gives a purchaser of a lot a private cause of action against any developer or agent who violates section 1703. The version of section 1703 in effect at the time of this transaction provided as follows:
 
 
 18
 (a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails
 
 
 19
 (1) to sell or lease any lot in any subdivision unless a statement of record with respect to such lot is in effect in accordance with section 1407 (1706) of this title and a printed property report, meeting the requirements of section 1408 (1707) of this title, is furnished to the purchaser in advance of the signing of any contract or agreement for sale or lease by the purchaser; and
 
 
 20
 (2) in selling or leasing, or offering to sell or lease, any lot in a subdivision
 
 
 21
 (A) to employ any device, scheme, or artifice to defraud, or
 
 
 22
 (B) to obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or
 
 
 23
 (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.
 
 
 24
 Title XIV, § 1404, 82 Stat. 476, 591 (1968). We hold this section did not confer a cause of action for representations of future occurrences that the developer in good faith intended, at the time of sale, to carry out. See Campbell v. Glacier Park Co., 381 F.Supp. 1243, 1249 (D.Idaho 1974). Cf. Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201, 203 (S.D.N.Y.1964) (Securities Act). Our holding, we believe, is in accord with Congress' intention. Recognizing the problem created when developers become bankrupt before completing promised amenities, Congress amended section 1703 in 1979 to provide a contractual basis for relief when roads, utilities and recreational amenities are not in fact completed by developers.[2] The following excerpt from the legislative history explains the intended effect of the addition of section 1703(a)(2)(D):
 
 
 25
 The bill would also require that whenever a developer represents orally or in writing that roads, sewers (including septic systems), water or electric service, or recreational amenities will be provided or completed by the developer, the contract of sale or lease must stipulate that such services or amenities will be provided or completed. This provision was intended to assure that when developers or their sales agents make seductive promises through oral or written representations or advertisements to induce individuals to buy land, the individuals have a contractual basis for assuring the services or amenities are completed within a reasonable time. It provides a statutory basis for suit if the contract fails to reflect the representations that were made.
 
 
 26
 H.R.Rep.No. 96-154, 96th Cong., 1st Sess. 36, reprinted in (1979) U.S.Code Cong. & Admin.News, pp. 2317, 2351-52.
 
 
 27
 Plaintiffs have likewise failed to prove a cause of action under the common law. New Mexico follows the well-settled ruled that a representation of future events is not actionable fraud except when there is a misstatement of present intent. Telman v. Galles, 41 N.M. 56, 63 P.2d 1049, 1052 (1936). See also W. Prosser, Law of Torts § 109, at 728-31 (4th ed. 1971).
 
 
 28
 The judgment is reversed with directions to enter judgment in favor of defendants.
 
 
 
 [1]
 The finding reads as follows:
 
 
 [21]
 The failure of PPI, Inc., to provide the amenities detailed in their statement of record and property report and as explained to plaintiffs by the sales agents and representatives of PPI, Inc., was fraud and deceit with respect to the lot and subdivision which the plaintiff relied upon in purchasing Lot 5, Unit 4-2
 Although characterized as a finding of fact, this statement is arguably a conclusion of law.
 
 
 [2]
 Section 1703 was amended to add that it is unlawful for a developer or agent selling nonexempt lots:
 (D) to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed.
 See Pub.L.No. 96-153, § 403, 93 Stat. 1101, 1127 (1979).