Mr. and Mrs. Lowell E. ACKMANN, Mr. and Mrs. Noble Arnold, Russell Dashow, Mr. and Mrs. Donald Gregor, Mr. and Mrs. James F. Huntington, Dr. and Mrs. Paul Jacobi, Mr. and Mrs. Linas Jurcys, Mr. and Mrs. Helmut Kanoldt, Mr. and Mrs. William Lundberg, Mr. and Mrs. Fred H. Olander, L. Douglass Piggott, Mr. and Mrs. Harold Schimanski, Mr. and Mrs. Gerald W. Schultz, Mr. and Mrs. Richard Siakel, Mr. and Mrs. Ted Stockfish, Mr. and Mrs. Grant Taylor, Mr. and Mrs. Michael Toll, Mr. and Mrs. Ronald Vargason, Mr. and Mrs. Fred Weinert, Mr. and Mrs. Roy Kopeikin and Mr. and Mrs. Philip Wangelin, Petitioners,

v.

MERCHANTS MORTGAGE & TRUST CORPORATION, Respondent.

No. 80SC178.

Supreme Court of Colorado,
En Banc.

May 3, 1982.

Rehearing Denied May 24, 1982.

Arthur L. Fine, Denver, Davis, Miner & Barnhill, George F. Galland, Jr., Chicago, Ill., for petitioners.

Davis, Moorhead & Ceriani, P. C., Gary J. Ceriani, Denver, for respondent.

Thomas S. Martin, Acting Asst. U. S. Atty. Gen., Washington, D. C., Joseph F. Dolan, U. S. Atty., for the Dist. of Colo., Denver, Anthony J. Steinmeyer, Mary A. McReynolds, Washington, D. C., for United States as amicus curiae; Peter S. Race, Terrence G. Simpson, U. S. Department of Housing and Urban Development, Washington, D. C., of counsel.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., B. Lawrence Theis, First Asst. Atty. Gen., Denver, for the State of Colo. as amicus curiae.

LOHR, Justice.

The plaintiffs were awarded judgment against Merchants Mortgage & Trust Corporation on a jury verdict in Arapahoe County District Court. The judgment cancelled their obligations on promissory notes given in partial payment for lots in the Stagecoach land development project near Steamboat Springs and awarded them damages in the respective principal amounts each had paid on the notes. The Colorado Court of Appeals reversed, holding that the evidence was insufficient to support the plaintiffs' claim that they had been induced to execute the notes by fraudulent concealment of material facts by Woodmoor Corporation, the seller of the lots. *Ackmann v. Merchants Mortgage & Trust Corp.*, Colo. App., 619 P.2d 501 (1980). We granted certiorari and now reverse the decision of the court of appeals because that court applied an incorrect standard in delineating the developer's duty of disclosure. .

**I.**

The present case has a rather complex factual and procedural background. Both must be set forth in some detail in order to understand the issues before this court and our resolution of them.

A. *General Factual Background*

The present action stems from the financial collapse of Woodmoor Corporation (Woodmoor) in January 1974. Woodmoor was a real estate development company founded in 1963. From its inception until 1970, Woodmoor concentrated on the devel-

opment of one residential project, initially consisting of approximately 2,000 acres, located in Monument, Colorado, and known as Woodmoor at Monument. In 1970 and 1971, Woodmoor embarked on an ambitious expansion program. It initiated six new projects, including: Woodmoor Mountain, near the initial Monument, Colorado, development; Roxborough Park, 25 miles southwest of downtown Denver; and Stagecoach, a second-home resort community located near Steamboat Springs, Colorado. The Stagecoach project, consisting of approximately 12,000 acres and having an initial estimated development cost of 25 to 35 million dollars, was much larger than Woodmoor's other real estate projects.

Woodmoor encountered serious problems in obtaining adequate financing to develop its projects, and an increasingly critical cash flow problem developed in 1972 and 1973. Faced with rising interest rates, declining sales, and exhaustion of its sources of credit, Woodmoor filed a petition in bankruptcy on January 31, 1974. At various times following Woodmoor's declaration of bankruptcy, individuals who purchased lots at Woodmoor at Monument, Roxborough Park, Woodmoor Mountain, and Stagecoach stopped making payments on the promissory notes they had signed in partial payment for the purchase of their property. The defendant, Merchants Mortgage & Trust Corporation (Merchants), had purchased a number of those notes from Woodmoor in 1972 and 1973. When Merchants insisted upon payment, the plaintiff lot purchasers brought the instant action, seeking invalidation of the notes and other relief.

### B. Pre-Trial Proceedings

The plaintiffs' complaint was originally filed on behalf of approximately 80 named plaintiffs and other persons similarly situated. The complaint contained four claims for relief. The first three claims sought affirmative relief from Merchants on the grounds that: (1) Merchants aided Woodmoor in defrauding the plaintiffs in violation of the Colorado Securities Act, section 11–51–101 et seq., C.R.S. 1973; (2) Merchants aided Woodmoor in violating the Interstate

Land Sales Full Disclosure Act (ILSFDA), 15 U.S.C. § 1701 et seq.; and (3) Merchants committed common law fraud against the plaintiffs and breached certain asserted contractual and fiduciary obligations to the plaintiffs. The fourth claim for relief averred that Woodmoor's conduct violated the securities laws of Colorado and the United States and the Interstate Land Sales Full Disclosure Act, and constituted common law fraud and breach of contract. It further alleged that Merchants was not a holder in due course of the plaintiffs' promissory notes executed in connection with their transactions with Woodmoor, and that Merchants consequently took the notes subject to the defenses that the plaintiffs could have asserted against Woodmoor. Merchants counterclaimed to collect the full amount of the promissory notes that it had purchased.

For purposes of their complaint the plaintiffs were divided into two classes, A and B. Class A consisted of each plaintiff who had purchased a lot at Stagecoach, Woodmoor at Monument, or Woodmoor Mountain, who had executed a promissory note in connection with the purchase, and whose note had been assigned to Merchants. Class B has no continuing relevance to this appeal and so will not be described. The first three claims for relief were brought on behalf of both classes. The fourth claim for relief was asserted only by Class A.

Subsequently, the named plaintiffs moved for class certification pursuant to C.R.C.P. 23. With respect to the first three claims for relief, the plaintiffs sought certification to represent others similarly situated in Classes A and B. With respect to the fourth claim for relief, the plaintiffs sought certification to represent others in Class A who were in the same situation. The issues were briefed, and on March 7, 1978, the trial court entered an order denying the plaintiffs' motion.

Immediately before trial, the plaintiffs stipulated to a dismissal of their first three claims for relief. Additionally, all plaintiffs connected with Woodmoor projects other than Stagecoach settled their claims before

trial and were dismissed. Also dismissed were the claims of all plaintiffs whose Stagecoach promissory notes were not acquired by Merchants. Trial of the remaining issues to a jury of six began on June 5, 1978.

### C. *The Trial*

The now-reduced group of plaintiffs consisted of forty individuals, suing in their individual capacities. At trial, these plaintiffs, pursuant to their fourth claim for relief, asserted three theories for avoiding liability on their notes: (1) violation of the Interstate Land Sales Full Disclosure Act; (2) failure of consideration; and (3) fraudulent concealment of material facts. In support of those claims the plaintiffs presented the following testimony and other evidence.

The plaintiffs purchased lots at Woodmoor's Stagecoach development between June 22, 1972, and September 14, 1973. In each case, the lot consisted of raw land which Woodmoor was to improve by providing roads, water, sewers, and other utilities. In addition, Woodmoor promised the installation of extensive recreational amenities including a golf course, lake, skiing area, swimming pools, and tennis courts.

The plaintiffs presented the testimony of Dale Wheeler, Woodmoor's corporate controller, treasurer, and vice-president of finance from May 1969 to December 1972. Wheeler explained Woodmoor's method of financing its projects. Typically, Woodmoor sold lots in its projects before the promised improvements or amenities were installed. The purchaser made a cash down payment, which was usually 10 percent of the purchase price, and executed a promissory note, secured by a deed of trust on the lot, for the balance. Woodmoor then either borrowed against the note or sold it to a third party. In the case of a sale, Woodmoor usually received about 70 percent of the principal amount of the note. The funds generated in this manner were then used for project development.

While this method of financing had been employed at Woodmoor at Monument with initial success, the results at Stagecoach were less happy. Wheeler testified that in 1971 he expressed concern to Woodmoor's president, Steve Arnold, over Woodmoor's rate of expansion. Wheeler testified that by the fall of 1971, before sales had started at Stagecoach, the cash flow situation was "tight." By the time sales at Stagecoach began in approximately January 1972, Woodmoor had a "very serious cash flow problem."

Until that time, Woodmoor had been borrowing from the Westinghouse Credit Corporation, using lot sale notes as security. However, because of limitations in that line of credit and the rejection of some notes by Westinghouse, Woodmoor began to sell Stagecoach notes to Merchants in early 1972. Woodmoor had sold notes to Merchants in the 1960s in connection with its Monument project, but had turned to borrowing against its notes because of the tax advantages. However, because of its cash flow problems, it decided to resume a substantial volume of note-sale business with Merchants. Wheeler testified that he told Merchants that Woodmoor needed to sell the notes because "we couldn't really operate our company without taking advantage of all the salable assets that we had and that we needed that cash."

This new source of funds, however, did not resolve Woodmoor's liquidity problem. By the spring of 1972, Woodmoor was unable to pay its bills when due, and the scheduled completion dates for its Stagecoach improvements were being delayed. In the summer of 1972, Woodmoor turned to the stock market for financing, raising almost two and a half million dollars through a stock offering. Wheeler testified that the offering was not a solution to the underlying cash flow problem and that this was never intended to be its purpose.

In October 1972, Woodmoor stopped paying certain of its creditors. In December 1972, Wheeler left the company. He testified that, given the direction the company was taking, he had some doubt whether it would survive.

The plaintiffs also called Oscar Ted Forde. Forde was Woodmoor's corporate treasurer from November 1, 1972, until Sep-

tember 30, 1973. He testified that, in addition to moneys obtainable by utilizing the single-family lot sale notes, Woodmoor needed 5 to 10 million dollars of supplemental financing for 1973. Forde suggested that the company make another public stock offering in order to generate these funds, but the idea was rejected. Woodmoor then sought a large development loan, but this search proved fruitless.

In late April 1973 Westinghouse Credit Corporation, Woodmoor's principal lender against lot-purchase notes, informed Woodmoor that its line of credit would be terminated. Also in the spring of 1973, sales at Woodmoor declined appreciably, and interest rates began a rapid ascent.

Because of a lack of cash, Woodmoor was forced to obtain extensions of two small loans in the spring of 1973, and in the summer of 1973 Woodmoor failed to meet its interest payments to Westinghouse. In the fall of 1973, shortly before leaving Woodmoor, Forde advised Woodmoor to seek a merger with another company, since Woodmoor's deteriorating condition was making its independent access to financing increasingly problematical. On January 31, 1974, Woodmoor filed for bankruptcy.

With the exception of four individuals, each of the plaintiffs also testified. They stated that they were not informed of Woodmoor's financial difficulties and that they bought on the assumption the project was sound. All testified that they would not have purchased their lots if they had known of Woodmoor's troubles.

At the close of the plaintiffs' case, Merchants moved for a directed verdict, contending that the plaintiffs' evidence did not establish *prima facie* a valid defense to the notes. The trial court granted the motion as to the plaintiffs' defenses based on the alleged violation of the Interstate Land Sales Full Disclosure Act and the alleged failure of consideration. It denied the motion as to the plaintiffs' contention that they were excused from liability on the notes because of fraudulent concealment by Woodmoor. The court directed a verdict on all issues against Roy and Karen Kopeikin and Philip and Judith Wangelin. The court concluded that, because these plaintiffs had not testified, they had not presented sufficient evidence to avoid a directed verdict.

After the presentation of Merchants' evidence, the case was submitted to the jury.[1] The jury returned special verdicts in favor of each of the plaintiffs. In each case, the jury found that the plaintiffs' fraud defense to the notes was valid, and that Merchants was not a holder in due course. With the exception of Frederic and Mary Olander, each plaintiff was also found entitled to reimbursement from Merchants for all principal payments previously made on the notes.

Merchants appealed. It asserted numerous errors in the trial, including the trial court's refusal to direct a verdict in its favor. Merchants argued that, as a matter of law, the plaintiffs had failed to sustain their burden of proving fraudulent conduct on the part of Woodmoor. The plaintiffs cross-appealed. The Kopeikins and Wangelins challenged the directed verdicts entered against them because of their failure to testify. The other plaintiffs challenged the directed verdict entered on their ILSFDA defense to the notes and the trial court's refusal to certify their case as a class action.

### D. *Disposition in the Court of Appeals*

The court of appeals reversed. It held that Merchants should have been granted a directed verdict on the plaintiffs' fraudulent concealment defense because the plaintiffs failed to establish every element required by that defense. Specifically, it held that the plaintiffs were required to prove that "Woodmoor concealed known present

---

1. At the close of the defendant's case, Merchants again moved for a directed verdict, this time contending that the evidence established that Merchants was a holder in due course of the notes as a matter of law, and that, consequently, it was not subject to any fraud defense that could have been asserted against Woodmoor. The trial court denied the motion. Merchants challenged this ruling before the court of appeals, but that court did not reach this issue and it is not now before us.

or past facts which made non-performance almost certain when it committed itself to install improvements in the future." *Ackmann v. Merchants Mortgage & Trust Corp., supra,* Colo.App., 619 P.2d at 506 (1980). It concluded that there was no evidence establishing this element, and reversed the judgment.

The court of appeals also held that the trial court correctly entered a directed verdict on the plaintiffs' ILSFDA defense. It reasoned that this defense required a showing of common law fraudulent intent, and that the evidence failed to establish this element. We granted certiorari to review the decision of the court of appeals. We first address that court's holding that the plaintiffs were required to show that Woodmoor knew it was almost certainly unable to perform its obligations to the plaintiffs.

## II.

The plaintiffs contend that the court of appeals erred in requiring them to show that Woodmoor concealed known past or present facts which made non-performance of its promises to install roads, utilities, and amenities almost certain. The plaintiffs argue that this requirement reflects an erroneous interpretation of Colorado precedent. We agree.

■ The elements of fraudulent concealment [2] were set out in the leading case of *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937). They are: (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted

upon; and (5) action on the concealment resulting in damages. 100 Colo. at 477–78, 68 P.2d at 462; *accord, e.g., Teodonno v. Bachman,* 158 Colo. 1, 404 P.2d 284 (1965); *Xerox Corp. v. ISC Corp.,* Colo.App., 632 P.2d 618 (1981); *see also* CJI–Civ.2d 19:2 (1980). The jury in this case was instructed in accord with this definition.[3]

■ In order to prevail on a claim of fraudulent concealment, a plaintiff must show that a defendant actually knew of a material fact that was not disclosed. It is not enough that the defendant should have or might have known this fact. *Teodonno v. Bachman, supra.* Additionally, the plaintiff must show that the defendant's intent was to cause the plaintiff to act differently than he might otherwise have done if the information had been disclosed. *Morrison v. Goodspeed, supra.*

■ In finding that Woodmoor committed fraudulent concealment the jury necessarily found that these elements of the tort were present. The court of appeals does not suggest that the evidence does not support those findings, and our review of the record reflects that such findings are supported by substantial evidence and so cannot be disturbed on appeal. *E.g., Vigil v. Pine,* 176 Colo. 384, 490 P.2d 934 (1971).

■ However, the court of appeals held that in order to commit fraudulent concealment Woodmoor must have concealed facts that made non-performance almost certain. Such a requirement cannot be derived from *Morrison v. Goodspeed, supra.*

There, Clayton Morrison paid $10,000 to the defendants, who were officers of an investment company, for the purchase of certain stock in other corporations. The stock was to be delivered to Morrison when the balance of the purchase price was paid. However, financial difficulties forced the

---

2. We use the terms concealment and non-disclosure interchangeably. While the Colorado Jury Instructions draw a distinction between these terms, that distinction is not important for purposes of this case, and we use these terms in their more general sense. *See* CJI 2d 19:5 and 19:6.

3. The instruction submitted to the jury was actually drawn from CJI–Civ. 19:2 (1969) (now CJI–Civ.2d 19:2). The statement of the elements of fraud by concealment in the Colorado Jury Instructions is substantially similar to the articulation of those elements contained in our case law.

defendants into bankruptcy before any of Morrison's stock could be purchased. Morrison's administratrix sued the defendants for fraud, but lost in the trial court. She then appealed and this court reversed.

In response to the defendants' contention that a finding of fraudulent conduct would be inconsistent with the fact that the defendants delivered approximately three-quarters of a million dollars in stock to their customers following the Morrison sale, we stated:

> The fraud of which complaint is made, consummated when Morrison paid his money, is neither palliated nor aggravated by honest or dishonest deals with others. No more can failure to reveal such facts be excused by defendants' faith that they could save their admittedly insolvent company because of better business prospects incident to the "New Deal" or to any other hoped for favorable conditions. Equity does not permit one man to gamble *secretly* with another man's money, no matter how honest his motives or sanguine his expectation of success.

100 Colo. at 482, 68 P.2d at 464 (emphasis in original). The requirement imposed by the court of appeals that the concealed facts must make non-performance almost certain is contrary to our holding that sanguine expectations of success do not excuse non-disclosure of a material fact.

The error in imposing such a requirement is further demonstrated by our discussion of materiality in *Morrison v. Goodspeed, supra.* There, we quoted with approval from *Kerr, Fraud and Mistake* p. 43–44 (4th ed.):

> The test, therefore, of material inducement is not whether the plaintiff's action *would*, but whether it *might*, have been

different if the misrepresentation had not been made.

*Morrison v. Goodspeed, supra*, 100 Colo. at 479, 68 P.2d at 463 (emphasis in original).

By holding that fraud occurs only if the undisclosed fact makes non-performance almost certain, the court in effect requires that the fact be of such importance that the plaintiff's decision necessarily *would* have been different had he known that undisclosed fact. We specifically rejected such a narrow definition of materiality in *Morrison* and adhere to that position now.[4]

The court of appeals cited CJI–Civ.2d 19:13 (1980) in support of its holding. That jury instruction provides:

> A statement about what (will) (will not) (may) (may not) occur in the future is a false representation only if the statement proves to be false and the person making such a statement (claims to have special knowledge of other facts to support his statement which he does not have) (has special knowledge of other facts which he fails to disclose but which he knows makes his statement about the future highly improbable).

However, as a reading of that instruction demonstrates, it concerns affirmative false representations, not nondisclosure. This is made clear by the comments to CJI–Civ. 19:13, which provide that, "When appropriate, this instruction should be given in conjunction with Instruction 19:3." Instruction 19:3 defines a false *representation*, and it is, in turn, to be given in conjunction with Instruction 19:1, which prescribes the elements of liability for a false *representation*. Thus, these instructions simply have no applicability to the distinct tort of nondisclo-

---

4. After discussing the correct interpretation of materiality in *Morrison*, we turned to the defendants' contention that materiality is a question for the jury. We stated that where reasonable men could draw only one inference from the facts, materiality is a question of law. Since the defendants in *Morrison* concealed "present facts indicating their almost certain inability to fulfill the contract," we concluded that the undisclosed facts were material as a matter of law, and that we were not bound by

the jury's verdict in favor of the defendants. In the present case, the defendant now cites our "almost certain inability to fulfill the contract" language in support of the court of appeals' decision. However, as discussed above, that language is relevant only to whether the plaintiff has shown materiality as a matter of law, and is not a showing that the plaintiff must make in order to avoid a directed verdict or to prevail on the merits.

sure, which is defined in Instruction 19:2. The present action is based upon nondisclosure and not fraudulent representations. The court of appeals' reliance on Instruction 19:3 suggests that its holding stems from a confusion of these two distinct torts.

Consequently, we conclude that the court of appeals erred in holding that the plaintiffs had to show that Woodmoor was aware of and failed to disclose facts which made its non-performance almost certain. It was sufficient that Woodmoor failed to disclose known material facts with the intent to influence the plaintiffs' decision to purchase the Stagecoach property. The jury found that the proscribed nondisclosure had occurred and there is substantial evidence to support that finding. We therefore reverse the decision of the court of appeals.

Although it is not necessary in light of our holding to review the court of appeals' disposition of the plaintiffs' cross-appeal of the directed verdict dismissing their Interstate Land Sales Full Disclosure Act defense, that question has been fully briefed before this court and may arise in connection with further proceedings in this case. For those reasons, we elect to address the issue.

### III.

#### A.

The ILSFDA was enacted to "prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Development Co. v. Scenic Rivers Association*, 426 U.S. 776, 778, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205, 211 (1976). It requires that the "developer" of a "subdivision," as those terms are defined in § 1701,[5] file a "statement of

record" with the Secretary of Housing and Urban Development (Secretary). §§ 1703(a)(1), 1704. This document must disclose information relating to the selling price and terms, present condition, future plans, and state of title of the development. § 1705. The statement of record is available for public inspection. § 1704(d). In addition, a "property report" must be distributed to purchasers, containing some of the information prescribed for the statement of record and such additional information as the Secretary may deem "necessary or appropriate in the public interest or for the protection of purchasers." § 1703(a)(1), 1707(a). Sale or lease of property without compliance with these provisions is made unlawful by § 1703(a)(1).

The ILSFDA also contains an anti-fraud provision in § 1703(a)(2), and provides in § 1709 that a purchaser may sue the developer or his agent for a violation of that provision. The purchaser may bring his action in either federal or state court. § 1719. In § 1702 the ILSFDA exempts certain land transactions from its coverage.

The plaintiffs contend that, in addition to constituting common law fraud, Woodmoor's conduct also violated § 1703(a)(2)(C) of the ILSFDA, which provides:

(a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—

(2) in selling or leasing, or offering to sell or lease, any lot in a subdivision—

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

The trial court entered a directed verdict against the plaintiffs on this defense at the

---

**5.** Unless otherwise indicated, statutory section references are to Title 15 of the United States Code (1976). The ILSFDA was enacted on August 1, 1968 as Title XIV of the Housing and Urban Development Act of 1968, Pub.L.No. 90–448, 82 Stat. 476, 590. After the present cause of action arose, minor changes in the statute were effected with the passage of Pub.L.No.

93–383, 88 Stat. 633, 736 (August 22, 1974). The ILSFDA was again amended in 1978, Pub. L.No. 95–557, 92 Stat. 2080, 2127 (October 31, 1978), and in 1979, Pub.L.No. 96–153, 93 Stat. 1101, 1122 (December 21, 1979). Our references are to the ILSFDA as it existed at the time the claims for relief in this case arose.

close of their case. The plaintiffs challenged that ruling in their cross-appeal, and the court of appeals affirmed. It based its decision on its conclusion that in order to prevail on this defense the plaintiffs were required to show that Woodmoor acted with fraudulent intent and that the plaintiffs had failed to carry this burden. We disagree with the court of appeals and hold that an intent to defraud is not required under the provision of the ILSFDA at issue in this case.

As the United States Supreme Court has recognized, "The [ILSFDA] is based on the full disclosure provisions and philosophy of the Securities Act of 1933..." *Flint Ridge Development Co. v. Scenic Rivers Association, supra,* 426 U.S. at 778, 96 S.Ct. at 2433–34, 49 L.Ed.2d at 211. In this connection, the Court of Appeals for the Fifth Circuit has stated, "The underlying purpose of both [Acts] is that prior to the purchase the buyer must be informed of facts which would enable a reasonably prudent individual to make an informed decision about purchasing the security or the property." *Paquin v. Four Seasons of Tennessee, Inc.,* 519 F.2d 1105, 1109 (5th Cir. 1975), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976); *accord, Hester v. Hidden Valley Lakes, Inc.,* 495 F.Supp. 48 (N.D. Miss.1980). As relevant to the present case, the relationship between these two Acts is evidenced by the fact that § 17(a)(3) of the 1933 Securities Act (Securities Act), 15 U.S.C. § 77q(a)(3), is identical to the provision of the ILSFDA relied upon by the plaintiffs, 15 U.S.C. § 1703(a)(2)(C). Consequently, judicial interpretation and application of § 17(a)(3) of the Securities Act is persuasive guidance for our interpretation of the provision of the ILSFDA at issue before us.

In *Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the United States Supreme Court specifically addressed the question of whether the Securities and Exchange Commission (Commission) "is required to establish scienter—an intent on the part of the defendant to deceive, manipulate, or defraud—as an element of a Com-

mission enforcement action to enjoin violations of § 17(a) [of the Securities Act]...." *Id.* 446 U.S. at 686, 100 S.Ct. at 1950, 64 L.Ed.2d at 619–20. It stated:

[T]he language of § 17(a)(3), under which it is unlawful for any person "to engage in any transaction, practice, or course of business which *operates* or *would operate* as a fraud or deceit," (emphasis added) quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible.

*Id.* 446 U.S. at 696–97, 100 S.Ct. at 1955–56, 64 L.Ed.2d at 626. The court found no legislative history suggesting that the statute did not mean what it plainly seemed to say, and concluded that scienter was not an element of an action brought under this subsection of the Securities Act.

In reaching this conclusion, the court in *Aaron* relied in part upon its decision in *Securities and Exchange Commission v. Capital Gains Research Bureau Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), which involved a suit by the Commission for injunctive relief to enforce § 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6(2). That statute, similar to the proscription in § 1703(a)(2)(C) of the ILSFDA, prohibits any act or practice of an investment advisor that "operates as a fraud or deceit upon any client or prospective client."

The injunctive relief sought in *Capital Gains* was to compel an investment adviser to "disclose to his clients a practice of purchasing shares of a security for his own account shortly before recommending that security for long-term investment and then immediately selling the shares at a profit upon the rise in the market price following the recommendation." 375 U.S. at 181, 84 S.Ct. at 240, 11 L.Ed.2d at 277. The issue was whether the Commission had to show that the adviser was acting with the intent to injure the investor before it could compel such disclosure. The court concluded that it did not. In reaching this result, the court relied primarily upon the legislative history

of the Investment Advisers Act, which revealed "a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." 375 U.S. at 191–92, 84 S.Ct. at 283, 11 L.Ed.2d at 246. It refused to reach a result that "would defeat the manifest purpose" of the Act. *Id.*

The lesson to be drawn from *Aaron* and *Capital Gains* is that the language of § 1703(a)(2)(C) focuses upon the effect of a developer's conduct on a purchaser, and not the culpability of a developer. The plain meaning of that language is inconsistent with a scienter requirement and should be respected, unless a clear legislative intent to the contrary appears.

We find that the legislative history of the ILSFDA does not conflict with the plain meaning of § 1703(a)(2)(C). Rather, it reinforces our conclusion that a scienter requirement was not contemplated.[6] The Senate Report on the ILSFDA reflects that it has a broad remedial purpose, directed at the harm resulting from nondisclosure as well as from misrepresentation: "There have been far too many cases where all of the pertinent information is not disclosed, such as, the availability of convenient access and utilities." S.Rep.No. 1123, 90th Cong., 2d Sess. at 109 (1968). The report later continues, "Under present law, there is no effective means by which full and accurate information can be required." *Id.* Thus, while not specifically addressing the

scienter issue, it is clear that the thrust of the legislation was to secure full and accurate disclosure of all pertinent information. Since that goal could be frustrated by nondisclosure of material information, even though not accompanied by an intent to defraud, we are reluctant to interpret the legislation in a manner that would frustrate the full achievement of its objective.

Additionally, in its report to the Senate subcommittee considering the 1967 version of the ILSFDA, the Securities and Exchange Commission commented, "Section 17 of S. 275 [which is substantially similar to 15 U.S.C. § 1703(a)(2)] would apply not only to misrepresentations *knowingly* made but also to those made negligently or without adequate basis." *Interstate Land Sales Full Disclosure Act of 1967: Hearings on S. 275 Before the Subcommittee on Securities of the Senate Committee on Banking and Currency,* 90th Cong., 1st Sess. 226 (1967) (emphasis in original).

Further, when Congress enacted the ILSFDA, the Supreme Court had already decided *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., supra.* We must assume Congress was aware of the court's holding in that case that language substantially similar to § 1703(a)(2)(C) did not include a scienter requirement, and, absent a clear statement of legislative intent to the contrary, that Congress intended a similar interpretation to be followed under the ILSFDA. *See Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

---

6. Legislation directed at the problem of interstate land sales fraud was introduced in the Senate in 1966. S. 2672, 89th Cong., 2d Sess. (1966). The original bill, as did its successors, "follow[ed] the pattern of the Securities Act of 1933." *Interstate Land Sales Full Disclosure Act: Hearings on S. 2672 Before the Subcommittee on Securities of the Senate Committee on Banking and Currency,* 89th Cong., 2d Sess. 87 (1966) (statement of Manuel F. Cohen, Chairman of the Securities and Exchange Commission). The bill was revised and reintroduced as S. 275 in the next Congress. S. 275, 90th Cong. 1st Sess. (1976). Again, hearings were held. *Interstate Land Sales Full Disclosure Act*

*of 1967: Hearings on S. 275 Before the Subcommittee on Securities of the Senate Committee On Banking and Currency,* 90th Cong., 1st Sess. (1967). In 1968, the ILSFDA was again introduced, and was passed as Title XIV of the Housing and Urban Development Act of 1968, Pub. Law No. 90–448, 82 Stat. 476, 590 (August 1, 1968). Both in its earlier versions and as enacted, the ILSFDA contained the subsection now under consideration, 15 U.S.C. § 1703(a)(2)(C). *See* S. 2672, § 17(c), 89th Cong., 2d Sess. (1966); S. 275, § 17(c), 90th Cong., 1st Sess. (1967); Interstate Land Sales Full Disclosure Act § 1404(a)(2)(c), 15 U.S.C. § 1703(a)(2)(C).

In reaching this conclusion, we follow other courts that have held that liability under the ILSFDA is not constrained by the same requirements necessary to establish common law fraud. *See Hester v. Hidden Valley Lakes, Inc.*, 495 F.Supp. 48, 53 (N.D.Miss.1980) (in order to establish liability under ILSFDA plaintiffs need not show that defendant acted with intent to deceive or that plaintiffs relied upon the defendant's misrepresentations); *Bryan v. Amrep Corp.*, 429 F.Supp. 313, 317 (S.D.N.Y.1977) (to establish liability under ILSFDA plaintiffs not required to show they relied on material misrepresentation or omission); *Hoffman v. Charnita, Inc.*, 58 F.R.D. 86, 90–91 (M.D.Pa.1973) (to establish liability under ILSFDA plaintiffs not required to show they relied on material misrepresentation or omission); *but see Solomon v. Pendaries Properties, Inc.*, 623 F.2d 602 (10th Cir. 1980) (suggesting that ILSFDA requires plaintiff to show fraudulent intent).[7]

### B.

Merchants also asserts a number of alternative theories for sustaining the directed verdict granted in its favor on the ILSFDA defense. It contends that it is not subject to the Act because: (1) it is neither a developer nor agent of a developer within the meaning of the Act, and (2) that the Act specifically exempts the sale of evidence of indebtedness. It further contends that the plaintiffs' ILSFDA defense is in any case barred by the Act's statute of limitations. We find these arguments unpersuasive.

First, Merchant's contention that it is not within the coverage of the ILSFDA reflects a misunderstanding of the nature of the plaintiffs' claims. The plaintiffs do not complain that Merchants, as a "developer" or "agent," violated the ILSFDA.[8] Rather, they contend that Woodmoor violated the ILSFDA and that this defense can be asserted against Merchants because it is not a holder in due course, *see* sections 4–3–302 to –306, C.R.S. 1973.

In this context, the Colorado Court of Appeals has previously held that the purchaser may assert his ILSFDA defense against the holder of a note even though the holder was not the original developer or his agent. *Salter v. Vanotti*, 42 Colo.App. 448, 599 P.2d 962 (1979). The Supreme Court of Arizona has reached the same conclusion. *Stewart v. Thornton*, 116 Ariz. 107, 568 P.2d 414 (1977).

We believe these cases reflect the correct approach. It is not uncommon for a developer to sell a lot purchaser's note to a third party. If such a sale defeated application of the ILSFDA even though the developer had violated the ILSFDA and the purchaser of the note was aware of that violation, then the impact of that remedial legislation would be limited indeed. A plain reading of the ILSFDA does not require such a result, and we decline to limit

7. Although *Solomon* is capable of being read as holding that a developer or his agent does not violate the ILSFDA unless he acts with fraudulent intent, the court's statements suggesting such a holding are mere dicta under the facts of that case. The court stated in that case that, "The evidence indicates that the failure to complete the facilities was due to economic problems incurred several years after the Solomons' purchase." *Id.* 623 F.2d at 604. Consequently, the only issue before the court was "whether mere subsequent nonperformance of promises is sufficient to support a cause of action under the [ILSFDA]." *Id.* The court held that the ILSFDA does not "confer a cause of action for representations of future occurrences that the developer in good faith intended, *at the time of sale*, to carry out." *Id.* (emphasis in original). It appears, therefore, that the actual basis of the *Solomon* decision was that there was no misrepresentation of material fact or omission of material fact at the time of sale and that, for this reason, liability could not be imposed on the defendant. We believe this is the correct reading of *Solomon* and reject Merchant's contention that that case turned on the absence of fraudulent intent. Moreover, even if we adopted Merchants reading of *Solomon*, we could not follow that case in light of the overwhelming authority discussed above for reaching a contrary result.

8. That was in fact the contention underlying the first three claims for relief asserted by the plaintiffs against Merchants. As discussed above, however, those claims were dismissed before trial. The remaining claim for relief was based upon Woodmoor's, not Merchants', violation of the ILSFDA.

the impact of the ILSFDA in such a strained and inequitable manner.[9]

In support of its argument that the ILSFDA is inapplicable, Merchants also points to the exemption provision of 15 U.S.C. § 1702(a)(5):

(a) Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to—

(5) the sale of evidence of indebtedness secured by a mortgage or deed of trust on real estate.[10]

Merchants' argument, however, contains the same flaw as its contention that it is not a "developer" or an "agent of a developer." The plaintiffs do not contend that Woodmoor's sale of notes to Merchants was governed by the ILSFDA or that it violated the provisions of that Act. Rather, their contention is that Woodmoor violated the ILSFDA in the course of its initial transactions with the plaintiffs.

The apparent purpose of the exception in § 1702(a)(5) is simply to allow the developer to sell the notes and deeds of trust generated by his business in the secondary mortgage market without requiring the ILSFDA protections applicable to transactions between the developer and the lot purchasers. Such an exception makes sense because the parties to that transaction may be expected to be fully capable of protecting their interests. However, that exception cannot be allowed to undercut the protections contemplated by the ILSFDA for the lot purchaser. It is neither fair nor necessary to hold that the purchaser of a note who takes that note with knowledge of the defenses that could have been asserted against the original payee may sue for collection on that note free of the ILSFDA proscriptions that could have been asserted against the developer.[11]

Finally, Merchants contends that the plaintiffs' ILSFDA defense to Merchants' counterclaim for payment of their notes is barred by the statute of limitations provisions of the Act, 15 U.S.C. § 1711, which, at the time this action was commenced, provided:

No action shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 1709(b)(1) of this title, unless brought within two years after the violation upon which it is based. In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser.

**9.** Merchants' reliance on *Bartholomew v. Northampton National Bank of Easton*, 584 F.2d 1288 (3d Cir. 1978), *Adema v. Great Northern Development Co.*, 374 F.Supp. 318 (N.D.Ga. 1973), and *Zachery v. Treasure Lake of Georgia, Inc.*, 374 F.Supp. 251 (N.D.Ga.1974) is misplaced. In each of those cases, lot purchasers brought an action for affirmative relief against the lenders who had financed the developers. The plaintiffs contended that the lenders had violated the ILSFDA by directly participating in the developer's original unlawful lot sales. The courts held that the lenders could not be held liable under the ILSFDA because the lender was not a "developer" or "agent of a developer" within the meaning of the act. We do not question the result reached in those cases. However, the question of what conduct a lender must engage in before he is directly and independently liable under the ILSFDA, is not controlling on the question of whether an ILSFDA defense may be asserted against subsequent noteholders. We see nothing inconsistent between the cases cited above and our resolution of the present controversy.

**10.** The exception contained in 15 U.S.C. § 1702(a)(5) at the time this cause of action arose is now contained in 15 U.S.C. § 1702(a)(3). *See* 15 U.S.C. § 1702(a)(3) (Supp. IV 1980). The substance of this exemption provision remains unchanged.

**11.** Merchants cites *Bettis v. Lakeland, Inc.*, 402 F.Supp. 1300 (E.D.Tenn.1975) in support of its argument. That case apparently does hold that ILSFDA defenses which could be asserted against a developer may not be asserted against a lender because of the exemption contained in § 1702(a)(5). However, we do not believe this is a preferable interpretation of the statute, and we decline to follow that case.

Merchants contends that since the violation complained of in this case is covered by § 1709(b)(1), the applicable statute of limitations is two years and that this period expired before the instant suit was brought.

The plaintiffs contend that the limitations period was tolled and that, in any case, the limitations period is not a bar to the assertion of a defense to payment. We agree with the plaintiffs' last point and dispose of the issue on that basis.

■ The general rule is that a statute of limitations, although barring the use of a claim for affirmative relief after the limitations period has run, is not a bar to asserting that claim as a defense. 53 C.J.S. Limitations on Actions, § 104 at 1087; 51 Am. Jur.2d Limitations of Actions § 76 at 655. This rule has been repeatedly recognized in the present context, where an allegedly untimely claim is raised as a defense to a suit on a promissory note. Annot., 78 A.L.R. 1074, 1076 (1932). Such a defense may be raised against subsequent holders of the note as well as the original payee. *See Mid-State Homes, Inc. v. Johnston*, 547 P.2d 1302, 1306 (Okla.1976); *Hawkeye-Security Insurance Co. v. Apodaca*, 524 P.2d 874, 879 (Wyo.1974).

■ Consequently, the plaintiffs can assert their ILSFDA defense in response to Merchants assertion of the right to collect on the notes, regardless of whether the limitations period has run. As a result, we need not further address Merchants' statute of limitations argument.[12]

*Conclusion*

Our resolution of this case makes it necessary that the other issues raised in the appeal and cross-appeals be resolved. These include Merchants' claim that the trial court erred in not granting its motions for a directed verdict based on its asserted status as a holder in due course, Merchants' argument that the plaintiffs were not entitled to monetary relief, the plaintiffs' contention that their motion for class certification pursuant to C.R.C.P. 23 should have been granted, and the cross-appellants' challenge to the directed verdict entered against them because of deficiencies in proof resulting from their failure to testify. These questions have not been briefed or argued in this court. Although the plaintiffs urge us to review them directly rather than to return the matter to the court of appeals for further proceedings, we conclude that none of the compelling reasons contemplated by C.A.R. 50 to support bypassing the court of appeals is applicable to this case.

We reverse the decision of the court of appeals and return the case to that court for further proceedings consistent with the views expressed in this opinion.

**12.** Although the plaintiffs have brought this action and are nominally the parties seeking affirmative relief, it is clear that the central question in this suit is Merchants' right to collect on the notes and that the ILSFDA is relevant only to the extent it creates a defense to that right. Consequently, the plaintiffs' claim raises a question of defense to the notes rather than affirmative relief. The plaintiffs concede that the above exception to the statute of limitations is applicable only to the extent that the ILSFDA is asserted solely as a defense to Merchants' attempt to collect on the notes. They acknowledge that the ILSFDA statute of limitations would be applicable to the affirmative monetary relief they were awarded and that, if not tolled, would bar such relief. The plaintiffs contend, however, that the monetary relief they achieved was based upon the common law rather than the ILSFDA, and that they asserted the ILSFDA solely as a defense. Our decision is consequently limited to the question of whether the ILSFDA may be asserted as a defense to the notes, and we hold only that Merchants was not entitled to a directed verdict dismissing that defense. We note that Merchants has challenged the monetary award obtained by the plaintiffs. That issue is not before us and is left for resolution by the court of appeals in the course of further proceedings.