[Cite as *Allen v. NVR, Inc.*, 2012-Ohio-6174.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


KRISTA A. ALLEN, et al.                        :

    Plaintiffs-Appellants,              :          CASE NO.   CA2012-02-038

                               :          O P I N I O N
  - vs -                                                          12/28/2012

                               :

NVR, INC. d.b.a. RYAN HOMES, et al.,           :

    Defendants-Appellees.              :


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2010-06-2748


Kenneth G. Hawley, 810 Sycamore Street, 5th Floor, Cincinnati, Ohio 45202, for plaintiffs-appellants, Craig & Lisa W. Silverglade and Eric & Stephanie J. Fisbeck

Porter, Wright, Morris & Arthur LLP, Ryan P. Sherman, 41 South High Street, Columbus, Ohio 43215, for defendant-appellee, NVR, Inc. d.b.a. Ryan Homes

Jack F. Grove, 1251 Nilles Road, Suite 10, Fairfield, Ohio 45014, for defendant-appellee, Welsh Development Co., Inc.


       **PIPER, J.**

       {¶ 1}  Plaintiffs-appellants, Krista Allen, Craig and Lisa Silverglade, and Stephanie and Eric Fisbeck (Homeowners), appeal a decision of the Butler County Court of Common Pleas, granting summary judgment to defendants-appellees, NVR, Inc. d.b.a. Ryan Homes (Ryan Homes), and Welsh Development Company, Inc. (Welsh).

I. Statement of Facts

{¶ 2}  In July 2005, Ryan Homes entered into an agreement with Welsh to build homes in Tall Oaks, a future development within the city of Monroe.  According to the terms of the agreement, Welsh agreed to procure the necessary land, obtain approval from Monroe, and then develop the lots for future construction.  Ryan Homes agreed to purchase the lots from Welsh on which to build the new homes.  The agreement also indicated that Welsh, as the developer, would construct all improvements and planned amenities.  These planned amenities included a pool, walking trails, fishing ponds, picnic areas, a "tot lot," and a play/sports field.

{¶ 3}  Ryan Homes entered into an agreement with William and Barbara Trimble to purchase a large tract of farmland as the future site of the Tall Oaks subdivision.  Ryan Homes would later convey its rights under the purchase contract to Welsh, and Welsh assumed Ryan Homes' obligations to the Trimbles.

{¶ 4}  Jeffrey Hayes, Land Development Manager for Welsh, wrote to Monroe and asked that the Trimble property be rezoned to permit the development and construction of the Tall Oaks subdivision.  Within the request, Hayes indicated that Ryan Homes would be the exclusive builder for the community.  Hayes further indicated Welsh's intent to develop 200 single-family sites and to have approximately 20-25 acres of open space.  Monroe's Planning Commission met to consider Welsh's request, and voted unanimously to move forward on Welsh's preliminary request regarding the subdivision.

{¶ 5}  The Planning Commission met in May 2005 and considered final approval of the subdivision.  Representatives from Welsh and Ryan Homes attended and spoke to the commission. The representatives offered a planned unit development (PUD), a Ryan Homes building packet (showing home models and floor plans), as well as documents pertaining to the homeowners' association.  The commission voted unanimously to approve and

recommend the PUD for Tall Oaks, and subsequently entered into a PUD agreement with Welsh.

{¶ 6} Within the PUD, Monroe and Welsh agreed that Ryan Homes was the only approved builder for the subdivision and that no other homebuilder would be permitted to build within Tall Oaks without first obtaining a PUD amendment from the Monroe Planning Commission.

{¶ 7} In July 2005, Welsh entered into a Lot Purchase Agreement with Ryan Homes. Welsh agreed to sell the residential lots to Ryan Homes, and Ryan Homes paid Welsh a deposit of $592,500 toward the eventual purchase of 200 residential building lots. Also within the Lot Purchase Agreement, Welsh agreed to build/install the planned amenities, and Ryan Homes was given the right to review and approve the plans for all amenities. Ryan Homes agreed to collect $500 from each homeowner to be paid to Welsh as partial reimbursement of the costs to design and construct amenities to be included in the development.

{¶ 8} Welsh began developing the lots and basic infrastructure of the subdivision, and Ryan Homes began advertising and promoting lots for sale within Tall Oaks. The advertising included newspapers such as *The Kentucky Enquirer* and *The Cincinnati Enquirer*, as well as advertisements on the internet and postcards sent through the mails.

{¶ 9} In late 2006 through early 2007, potential homeowners began visiting the Tall Oaks development. Ryan Homes' sales representatives showed the potential buyers various model homes and advised the buyers about future plans for the development, including the amenities. Of these potential buyers, the Homeowners purchased lots and contracted with Ryan Homes to build houses, entering purchase agreements with Ryan Homes which included a provision that the amenities, including their very existence, were subject to change. The contracts also contained several blank spaces to write any additional oral statements or promises that the buyer wanted incorporated into the contract. Each of the

contracts in question stated "none" in this section, indicating no further oral representations had been made to the Homeowners that were not already properly stated in the contract.

{¶ 10} After Ryan Homes sold five lots/homes, a real estate market collapse occurred and no other lots were sold. Ryan Homes contacted Welsh and conveyed its intent to withdraw from the development agreement, and to stop selling homes in the Tall Oaks subdivision. Ryan Homes forfeited $577,677 of its deposit to Welsh, and informed the Homeowners of its decision to withdraw from the further development of Tall Oaks. Welsh was forced to relinquish the land on which the first phase of Tall Oaks was being constructed, as well as the still undeveloped portion of land to the original owners, the Trimbles, in lieu of foreclosure. The planned community went undeveloped and thus, the amenities intended to accompany the development of Tall Oaks were never built.

{¶ 11} The Homeowners filed suit against Ryan Homes and Welsh, alleging breach of contract, negligent misrepresentation, fraud in the inducement, violation of the Interstate Land Sales Full Disclosure Act (ILSA or the Act), and violation of the Ohio Consumer Sales Practices Act. Each of the Homeowners' claims center on allegations that Ryan Homes and Welsh were required to unconditionally and without reserve build the amenities. The initial suit was filed, and then voluntarily dismissed by the Homeowners when Welsh and Ryan Homes moved for summary judgment. However, the Homeowners subsequently re-filed the suit, alleging the same causes of action.

{¶ 12} Ryan Homes and Welsh moved for summary judgment after additional discovery was conducted. The trial court granted summary judgment to Ryan Homes and Welsh on each of the Homeowners' claims. The Homeowners now appeal the trial court's decision, but only in regard to the ILSA claim. Before we address the Homeowners' specific assignments of error, we will address relevant rules of law and set forth the necessary context within which this appeal will be determined.

## II. Summary Judgment Standard

{¶ 13} This court's review of a trial court's ruling on a summary judgment motion is de novo. *Broadnax v. Greene Credit Serv.*, 118 Ohio App.3d 881, 887 (2nd Dist.1997). Civ.R. 56 sets forth the summary judgment standard and requires that (1) there be no genuine issues of material fact to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion being adverse to the nonmoving party. *Slowey v. Midland Acres, Inc.*, 12th Dist. No. CA2007-08-030, 2008-Ohio-3077, ¶ 8. The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64 (1978).

{¶ 14} The nonmoving party "may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing the existence of a genuine triable issue." *Mootispaw v. Eckstein,* 76 Ohio St.3d 383, 385 (1996). A dispute of fact can be considered "material" if it affects the outcome of the litigation. *Myers v. Jamar Enterprises*, 12th Dist. No. CA2001-06-056, 2001 WL 1567352,*2 (Dec. 10, 2001). A dispute of fact can be considered "genuine" if it is supported by substantial evidence that exceeds the allegations in the complaint. *Id.*

## III. Introduction to the ILSA

{¶ 15} ILSA is an anti-fraud statute that was promulgated in response to increased fraud in the sale of undeveloped land.

> [I]n the late 1960's, Congress conducted hearings to address concerns about widespread real estate fraud. Purchasers living in the same state where the land was located or living out of state were persuaded to buy land they had never seen by sophisticated sales forces promising that land (which might be under water or suitable only for grazing purposes) was a good investment, suitable for homesites and easily resalable. In response, in 1968, Congress passed the ILSA.

Richard Linquanti, *Aspects of the Interstate Land Sales Full Disclosure Act*, 44 Real Prop. Tr.

& Est. L.J. 441 (2009).

**{¶ 16}** As stated by this court, ILSA is "an antifraud statute utilizing disclosure as its primary tool, much like the securities laws." *Akers v. Classic Properties, Inc.,* 12th Dist. No. CA2003-03-035, 2003-Ohio-5436, ¶ 25, quoting *Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1447 (11th Cir.1985). The ILSA is similar to the securities fraud statute because "'the underlying purpose of both (Acts) is that prior to the purchase the buyer must be informed of facts which would enable a reasonably prudent individual to make an informed decision about purchasing the security or the property.'" *Ackmann v. Merchants Mortg. & Trust Corp.,* 645 P.2d 7, 16 (Colo.1982), quoting *Paquin v. Four Seasons of Tennessee, Inc.*, 519 F.2d 1105, 1109 (5th Cir.1975), certiorari denied, 425 U.S. 972, 96 S.Ct. 2168 (1976).

**{¶ 17}** The ILSA "imposes detailed disclosure requirements upon land developers to ensure full disclosure to buyers of relevant facts prior to their decision to purchase real estate." *Akers* at ¶ 25, citing *Pierce v. Apple Valley, Inc.*, 597 F.Supp. 1480, 1484 (S.D.Ohio 1984). "The general purpose of the Land Act was, of course, to prohibit and punish fraud in such land development enterprises * * * and the Act should be interpreted to attain that end. Such an act should be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *McCown v. Heidler*, 527 F.2d 204, 207 (10th Cir.1975), quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195, 84 S.Ct. 275, 285 (1963).

**{¶ 18}** According to the pertinent section of the ILSA, 15 U.S.C. 1703(a)(2)(A)-(D),

> It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—
>
> (2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title—to employ any device, scheme, or artifice to defraud;
>
> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material

fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; or

(D) to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed.

As this section applies only to "developers" or "agents", we must first determine if Ryan Homes and/or Welsh is a developer or agent within the meaning of the Act.

IV. Ryan Homes and Welsh as Developers

{¶ 19} According to 15 U.S.C. 1701(5), a developer is "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision* * *."  Subdivision is then defined as "any land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."  15 U.S.C. 1701(3).  A common promotional plan is

> A plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.

15 U.S.C. 1701(4).

{¶ 20} We find that there are sufficient facts to establish that Ryan Homes and Welsh are developers as set forth in the Act.  The record is clear that Ryan Homes directly, and Welsh indirectly, offered for sale the lots in the Tall Oaks subdivision.  Even though Ryan

Homes purchased the lots from Welsh before conveying them to the Homeowners, Welsh indirectly sold the lots because each was held in Welsh's name until Ryan sold the lot to the purchaser and only then, was the land placed in Ryan Homes' name. The land was divided into proposed lots, and was offered for sale as part of a common promotional plan in that the lots were being developed and offered for sale as part of the common unit and name, Tall Oaks. Therefore, both Ryan Homes and Welsh are developers for the purposes of the Act.

### V. Summary Judgment in Favor of Ryan Homes

{¶ 21} Assignment of Error No. 1:

{¶ 22} THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT NVR'S MOTION FOR SUMMARY JUDGMENT UPON THE PLAINTIFFS' CLAIMS UNDER THE INTERSTATE LAND SALES FULL DISCLOSURE ACT.

{¶ 23} Homeowners argue in their first assignment of error that the trial court erred in granting summary judgment to Ryan Homes based on the ILSA.

{¶ 24} The Act makes certain actions by developers illegal when those developers directly or indirectly "make use of any means or instruments of transportation or communication in interstate commerce, or of the mails * * *." The record is clear that Ryan Homes used the mail, telephone, and internet to advertise Tall Oaks. That the Homeowners were Ohio residents is meaningless within the Act because the fact remains that Ryan Homes used instruments of communication by way of *interstate* commerce by choosing to promote Tall Oaks by mailing post cards and advertising the subdivision on the internet. *Smith v. Myrtle Owner, LLC*, 09-CV-1655 KAM VVP, 2010 WL 2539693 (E.D.N.Y. June 16, 2010).

{¶ 25} Having found that Ryan Homes is a developer that used interstate commerce in promoting the sale of lots in the Tall Oaks subdivision, we continue our analysis to determine whether there exist any genuine issues of material fact regarding whether Ryan Homes

violated the ILSA as set forth in 15 U.S.C. 1703(a)(2)(A)-(D) of the Act.

{¶ 26} According to subsections (A)-(C), as quoted above, the Homeowners need to demonstrate that there are genuine issues of material fact regarding fraud, untrue statements of material fact, or deceit. However, we find, as the trial court did, that there are no issues of fact regarding the first three subsections, as Ryan Homes truly intended at the time the Homeowners purchased their lots that the amenities would be built at some future date. See *Prebil v. Pinehurst, Inc.*, 638 F.Supp. 1314, 1318 (D.Mont.1986) (holding that the "untrue statement of material fact must exist at the time of sale to give rise to a violation under the Act").

{¶ 27} The record is clear that at the time Ryan Homes began advertising Tall Oaks and sold the lots and homes to the Homeowners, both Ryan Homes and Welsh made plans to move forward with the amenities once the appropriate number of homes was sold. Ryan Homes collected the $500 amenity fee from the Homeowners, and there is no indication that Ryan Homes or Welsh did not plan to build the amenities at the time Ryan Homes sold the lots to the Homeowners or collected the amenity fee from them. Only when the other 195 lots did not sell did Ryan Homes pull out of the deal, forcing Welsh to not only abandon its intention to build the amenities but also to return the land to the Trimbles. For this reason, the Homeowners are no longer pursuing their fraud claims against either Ryan Homes or Welsh, and there is no indication in the record that there was any fraud, untrue statements, or deceit as anticipated by the Act.

{¶ 28} The Homeowners must then demonstrate that there are genuine issues of material fact regarding subsection (D), and whether Ryan Homes represented that the community amenities would be provided without stipulating or disclosing in the sales contract its intentions regarding the amenities.

{¶ 29} The record contains the contracts signed by the Homeowners regarding the

purchase of the lots and the construction of their homes. Within each contract, the following provision is expressly stated, "[Homeowner] acknowledges that the timing of construction, location, existence, size, and features of tot lots, trails, community entry features and monuments, and recreational facilities within the community (collectively the "Facilities"), if any, are subject to change."

{¶ 30} The contract is not silent as to the amenities; it specifically stipulates that while the amenities were intended, they were not guaranteed. Therefore, we find that the contract of sales contains language stipulating the existence of amenities so that that Ryan Homes did not violate the Act because it addressed the subject of the discussed amenities and provided disclosure (*i.e.*, that the amenities were not guaranteed).

{¶ 31} The dissent questions the legality of a contract that permits the existence of planned amenities to be subject to change. In support of finding a genuine issue of material fact, the dissent incorrectly assumes that the developer must promise in the contract to build the amenities at any cost and under any set of circumstances in order to satisfy 15 U.S.C. 1703(a)(2)(D). In so reasoning, the dissent relies on the definition of "stipulate" as found in Webster's Third New International Dictionary as "a condition or requirement of an agreement or offer; to give a guarantee of." However, the dissent cites no relevant case law or statutory support for its interpretation of the ILSA to require the developer to include an absolute guarantee to construct amenities despite any and all circumstances *even if such a promise was never represented to the Homeowners.* More importantly, the dissent references no facts (material or otherwise) to suggest the parties were guaranteed amenities regardless of the circumstances. In other words, what was "stipulated" (disclosed for purposes of agreement) in the contract was the parties' understanding. Despite the mutual expectation of both parties, there are no material facts demonstrating the Homeowners were ever led to believe community amenities would unconditionally and absolutely be constructed,

regardless of the circumstances.

**{¶ 32}** The Tenth Circuit Court of Appeals was asked to determine whether purchasers of lots in a development had a cause of action pursuant to the ILSA when the developer failed to construct all amenities the developer represented would be part of the completed subdivision. *Solomon v. Pendaries Properties, Inc.*, 623 F.2d 602 (10th Dist. 1980). In *Solomon*, the court noted that the developers planned and advertised several amenities, including ponds, swimming pools, a golf course, pro shop, tennis courts, security system, golf course club house, main lodge with additional facilities, complete water system, campgrounds, saddle club area, front entrance beautification, and streets built to specific specifications.

**{¶ 33}** The court noted that due to a national "depressed economic state" and the developer's inability to sell additional lots, not all of the amenities had been constructed as promised. *Id.* at 603. Nonetheless, the court held that the lot owners did not have a cause of action within the ILSA because the developer did not misrepresent its intention to complete the amenities at the time the owner purchased the lots. The court concluded that the version of the ILSA in place at the time of the purchase did not "confer a cause of action for representations of future occurrences that the developer in good faith intended, at the time of sale, to carry out." *Id.* at 604.

**{¶ 34}** The *Solomon* case did not construe 15 U.S.C. 1703(a)(2)(D) because Congress had not promulgated that section at the time the lots were sold. However, we nonetheless find the case persuasive because the court analyzed the amendment made to the Act in 1979, which added specific mention of amenities. The court stated its belief that finding no cause of action for failure to complete amenities as promised comported with the 1979 amendment in which Congress addressed the "problem created when developers become bankrupt before completing promised amenities." *Id.* The court reasoned that Congress

amended ILSA to "provide a contractual basis for relief when roads, utilities, and recreational amenities are not in fact completed by developers." *Id.* The court then noted this very pertinent piece of legislative history.

> The bill would also require that whenever a developer represents orally or in writing that roads, sewers (including septic systems), water or electric service, or recreational amenities will be provided or completed by the developer, the contract of sale or lease must stipulate that such services or amenities will be provided or completed. This provision was intended to assure that when developers or their sales agents make seductive promises through oral or written representations or advertisements to induce individuals to buy land, the individuals have a contractual basis for assuring the services or amenities are completed within a reasonable time. It provides a statutory basis for suit *if the contract fails to reflect the representations that were made.*

*Id.* at 605, quoting H.R.Rep. No. 96-154, 96th Cong., 1st Sess. 36, reprinted in (1979) U.S.Code Cong. & Admin.News, 2317, 2351-52. (Emphasis added.)

{¶ 35} Given the overall purpose of the Act to provide adequate facts in order to ensure that the purchaser can make an informed decision, and Congress' intention that a developer include in the contract any representations made regarding amenities, the inclusion of an express contract clause regarding amenities in the purchase contract demonstrates that Ryan Homes has not violated the Act.

{¶ 36} There is no dispute that the Homeowners were told of the amenities before they purchased lots and contracted to construct homes. However, there is also no dispute that the Homeowners' contracts expressly state that the amenities, even their existence, were subject to change. This contract term was reasonable given the circumstances of subdivision development because the amenities were attendant to the *subdivision development*, not any one homeowner.

{¶ 37} Ryan Homes, once unable to sell and construct 195 additional homes, was forced to withdraw from the development deal with Welsh, and Welsh was forced to return

the undeveloped land to the Trimbles. This is not the case where Welsh and Ryan Homes sold 200 lots, then walked away from Tall Oaks with their respective profits without first constructing the amenities as planned for the community. Here, construction and maintenance of a community swimming pool, tot lots, and walking trails became infeasible by the sale of only five lots, rather than 200. Nowhere does the evidence suggest that Ryan Homes could have developed the community had it chosen to.

{¶ 38} Regardless of the eventual outcome, the fact remains that at the time of sale, the parties to the contracts knew, understood, and agreed that the amenities, including their existence, were subject to change.[1] Unlike purchasers being told that swampland for sale in Florida would be a wonderful home sight, when exactly the opposite is true, the Homeowners here expressly agreed that despite intentions and plans, the amenities may not exist. Moreover, the Homeowners were given the opportunity to include any promises or representations that they believed were material to the contract. None of the Homeowners expressed a desire for the inclusion of a guarantee that the community amenities were to be provided regardless of the circumstances. Unlike the dissent, we cannot imply an oral representation so as to demand its later inclusion into a written contract.

{¶ 39} We are left with the express contract term entered into by the Homeowners, stipulating that the amenities would be constructed, but were subject to change.[2] It is the Act that required inclusion in the contract of an understanding regarding the amenities. Regarding the dissent's proposition that the contract was "illusory" because of this provision,

---

1. The dissent emphasizes "*at the time the contracts were entered into,*" yet, at that particular time, the parties to the contracts expounded upon and solidified their knowledge, understanding, and agreements.

2. The trial court properly relied on the Parol Evidence Rule to exclude alleged oral representations that were not expressed in the contract. See *Meade v. Kurlas*, 12th Dist. No. CA2010-08-216, 2011-Ohio-1720, ¶ 15 (finding that "a written contract must be construed and interpreted from its four corners without consideration of parol evidence, *i.e.*, evidence that would contradict or vary the terms of the contract. The parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement").

we note that the Homeowners do not premise their claim on illusory contracts. Moreover, the Homeowners have abandoned all contract and fraud claims on appeal, pursuing their assignments of error solely upon alleged statutory violations.

{¶ 40} As previously stated, the Act must be treated with flexibility to effectuate its purposes, mainly to require disclosure from land developers so that purchasers would be reasonably well-informed before purchasing land. Homeowners had all purchased homes on previous occasions, and according to the record, were educated and sophisticated individuals who entered into their respective contracts fully aware of the provisions within. The contract stipulating the intention to construct the community amenities did not do so unconditionally or without the possibility of change. With the absence of any supporting material facts, it is unreasonable to determine that Homeowners were promised a guarantee of amenities. Similarly, despite best intentions, there was no promise or guarantee the subdivision would be filled to its planned capacity. Yet it cannot be said Homeowners went forward with their lot purchase and home construction without full disclosure and knowledge. With the circumstances at hand, the Act has not been violated.

{¶ 41} Having found that Ryan Homes did not violate the ILSA, we need not discuss the other exemptions or exclusions that may apply to Ryan as stated within the Act. We find that there are no genuine issues of material fact to be litigated so that Ryan Homes is entitled to judgment as a matter of law. Homeowners' first assignment of error is overruled.

VI. Summary Judgment in Favor of Welsh

{¶ 42} Assignment of Error No. 2:

{¶ 43} THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT WELSH'S MOTION FOR SUMMARY JUDGMENT UPON THE PLAINTIFFS' CLAIMS UNDER THE INTERSTATE LAND SALES FULL DISCLOSURE ACT.

{¶ 44} The Homeowners argue in their second assignment of error that the trial court

erred in granting summary judgment in favor of Welsh.

{¶ 45} There is no dispute in the record that the Homeowners did not enter into a contract with Welsh. Instead, the Homeowners assert that Welsh is implicated because Ryan Homes and Welsh have been "intertwined and working in concert from the very outset to the ultimate demise of this subdivision." However, the Act provides that only developers, or their agents, who use means of interstate commerce are subject to 15 U.S.C. 1703(a)(2)(A)-(D).

{¶ 46} While we have previously found there are sufficient facts to establish that Ryan Homes and Welsh are developers within the confines of the Act, the record indicates that the only developer to use means of interstate commerce to sell the lots or offer them for sale was Ryan Homes. Welsh did not engage in the same type of conduct that Ryan Homes did in order to promote, market, and sell Tall Oaks subdivision. Its only communication with the eventual Homeowners was once they purchased lots and contracted with Ryan Homes to construct homes, and this communication was specific to the development and control of the homeowners association.

{¶ 47} Moreover, Welsh is not subject to the Act because 15 U.S.C. 1702(a)(7) states that the ILSA does not apply to the "sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings or for the purpose of resale or lease of such lots to persons engaged in such business * * *." Welsh purchased the Trimble land, and then divided and developed the lots to be sold to Ryan Homes. There was never privity of contract or any transaction between Welsh and the Homeowners, and Welsh's only involvement was to sell the land to Ryan Homes, which was engaged in the business of constructing residences on the developed lots. The Homeowners concede as much, but argue that Welsh should be held to the ISLA standards because of the relationship it shared with Ryan Homes.

{¶ 48} As previously discussed, Ryan Homes was a developer that communicated by means of interstate commerce, so that according to the ILSA, Welsh could still be subject to the Act if it was acting as Ryan Homes' agent. 15 U.S.C. 1703(a). According to 15 U.S.C. 1701(6), an agent is "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision * * *." Therefore, if Welsh were acting for or on behalf of Ryan Homes in selling or offering to sell the lots, then it would be subject to the Act. However, we find there are no facts establishing an agency relationship between Welsh and Ryan Homes within the meaning of the Act.

{¶ 49} The record indicates that Ryan Homes and Welsh had two disparate and very distinct roles in the planning, development, marketing, and construction of the Tall Oaks subdivision. We are not in any way indicating that Ryan Homes and Welsh were not both interested in the success of the subdivision or that they did not share common goals. However, such does not rise to the level of acting on behalf of or representing each other.

{¶ 50} The record indicates that Welsh was at all times the developer of the Trimble land, and that its involvement in Tall Oaks was to divide and develop the land into lots. Welsh would then sell the developed lots to Ryan Homes, which in turn, would sell the lots and construct homes on them. Welsh did not represent or act on behalf of Ryan Homes when offering to sell the lots because the lots were only sold to Ryan Homes as the exclusive homebuilder. Neither did Welsh represent or act on behalf of Ryan Homes when Ryan Homes marketed, promoted, and advertised the Tall Oaks subdivision to possible purchasers. Again, the only time the Homeowners had any interaction with Welsh was after they purchased the lots and homes, and began to pay homeowners association fees to maintain the entrance signage and associated landscaping.

{¶ 51} The ILSA limits application to developers or their agents who use means of interstate commerce to sell or offer to sell lots. Welsh neither used means of interstate

commerce nor was an agent of Ryan Homes, and as such, does not fall under the purview of the Act. As such, the trial court properly granted summary judgment to Welsh, and the Homeowners' second assignment of error is overruled.

{¶ 52} Judgment affirmed.

S. POWELL, P.J., concurs.

RINGLAND, J., dissents.

**RINGLAND, J., dissenting.**

{¶ 53} While I agree with the majority's determinations regarding the first three antifraud provisions of the ILSA in relation to Ryan Homes and its determinations regarding Welsh, I must dissent from the majority's conclusion that Ryan Homes is entitled to judgment as a matter of law as to the fourth antifraud provision found within 15 U.S.C. 1703(a)(2)(D).

{¶ 54} As indicated by the majority, 15 U.S.C. 1703(a)(2)(D) prohibits a developer from representing that "recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed." Nevertheless, the majority goes on to conclude that stating in a contract that the *existence* of any promised amenities is "subject to change" is the same as *stipulating* that those amenities will be provided or completed.[3] It appears that one great divide between the majority and myself turns on the definition and application of the word "stipulating."

{¶ 55} It is a settled principle that words in an act or statute shall be given their plain

_____

3. As indicated by the majority, the purchase contracts in this case each contain a provision which states:

> [Homeowner] acknowledges that the timing of construction, location, existence, size, and features of tot lots, trails, community entry features and monuments, and recreational facilities within the community (collectively the "facilities"), if any, are subject to change.

and ordinary meaning unless the legislative intent indicates otherwise. *Devere v. Miami University Bd. of Trustees*, 12th Dist. No. CA86-05-065, 1986 WL 6763, * 3 (June 10, 1986); *Taniguichi v. Kan Pacific Saipan, Ltd.*, ___ U.S. ___, 132 S.Ct. 1997 (2012). The definition of "stipulate" (the verb form of the Act's present participle, "stipulating") is "to specify as a condition or requirement of an agreement or offer; to give a guarantee of." Webster's Third New International Dictionary (1993) 2245. Thus, based upon the ordinary meaning of "stipulate," 15 U.S.C. 1703(a)(2)(D) should be read as follows: With respect to the sale or lease of a lot, a developer is prohibited from representing that "recreational amenities will be provided or completed by the developer without [specifying as a condition or requirement] in the contract of sale or lease that such * * * amenities will be provided or completed."

{¶ 56} It is clear that there is limited case law on this issue, as is evidenced by the majority's reliance on a case which addresses a previous version of the ILSA that did not contain 15 U.S.C. 1703(a)(2)(D).[4] *See also Venezia v. 12th & Div. Properties, LLC*, 685 F.

---

4.      {¶a} The 1968 version of the ILSA applicable to the *Solomon* case contained the following version of 15 U.S.C. 1703:

{¶b} (a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails

{¶c} (1) to sell or lease any lot in any subdivision unless a statement of record with respect to such lot is in effect in accordance with section 1407 (1706) of this title and a printed property report, meeting the requirements of section 1408 (1707) of this title, is furnished to the purchaser in advance of the signing of any contract or agreement for sale or lease by the purchaser; and

{¶d} (2) in selling or leasing, or offering to sell or lease, any lot in a subdivision

{¶e} (A) to employ any device, scheme, or artifice to defraud, or

{¶f} (B) to obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or

{¶g} (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

Pub. L. No. 90–448, Title XIV, 82 Stat. 476, 590 (1968).

Supp.2d 752, 756 (M.D.Tenn.2010) ("This Court's research reveals a surprising dearth of case law construing the [ILSA]"). Nevertheless, relevant secondary sources indicate that 15 U.S.C. 1703(a)(2)(D) should be read to *require* developers to provide or complete the amenities they promised. Feldman, *The Interstate Land Sales Full Disclosure Act: An Overview*, 38 Colo. Law. 93 (2009) ("[T]o satisfy the anti-fraud provision of the Act, the contract must contain express language that discloses to purchasers which utilities and recreational amenities the developer agrees to complete"); Linquanti*, Aspects of the Interstate Land Sales Full Disclosure Act*, 44 Real Prop. Tr. & Est. L.J. 441 (2009) ("Section 1703(a)(2) says that the developer cannot * * * represent that utilities, roads, and amenities will be provided without contractually committing to their construction").

{¶ 57} Even the language relied upon by the majority leans towards the finding that a contract must require that promised amenities will be provided or completed:

> The bill would also require that whenever a developer represents orally or in writing that * * * recreational amenities will be provided or completed by the developer, the contract of sale or lease must stipulate that such services or amenities will be provided or completed. This provision was intended to assure that when developers or their sales agents make seductive promises through oral or written representations or advertisements to induce individuals to buy land, the individuals have a contractual basis for *assuring the services or amenities are completed* within a reasonable time. It provides a statutory basis for suit if the *contract fails to reflect the representations that were made.*

(Emphasis added.) *Solomon*, 623 F.2d at 605, quoting H.R.Rep. No. 96-154, 96th Cong., 1st Sess. 36, reprinted in (1979) U.S.Code Cong. & Admin.News, pp. 2317, 2351-52. As clearly stated, the purpose in adding 15 U.S.C. 1703(a)(2)(D) to the ILSA is to allow an individual who has been promised amenities to have a contractual basis for *assuring* that amenities *are completed*. The purpose is not to allow a contract provision that states promised amenities may or may not ever be completed.

{¶ 58} In this case, the purchase contracts between the Homeowners and Ryan Homes did not "reflect the representations that were made." Rather, the contracts state that the existence of any recreational amenities is "subject to change" and, thus, may never occur. This "subject to change" provision, read as a whole, creates an unfettered discretionary release of obligations on behalf of Ryan Homes, where the developer is under no obligation to justify a failure to complete these amenities or even to provide them. As written and interpreted by the majority, Ryan Homes is under no obligation to satisfy the representations it previously made and, in essence, creates an illusory contractual provision.[5]

{¶ 59} This is not to say that I find the contract to actually be illusory. As the majority points out, the Homeowners never brought such a claim and abandoned their contract and fraud claims on appeal. Rather, my point is that the purchase contracts drafted by Ryan Homes promise nothing concerning any amenities, similar to that of an illusory contract. The deliberate lack of any promise in the "subject to change" provision calls into question the enforceability of such a provision, as well as the motivation and intent of Ryan Homes in drafting the provision. By Ryan Homes' drafting of the contract so that it has the unlimited right to determine whether amenities will exist, there is a suggestion that Ryan Homes intended to evade application of 15 U.S.C. 1703(a)(2)(D) altogether. This suggested intent, in and of itself, may be a question of fact warranting a reversal of the trial court's decision.

{¶ 60} While I appreciate, as the majority points out, that this is not a case where Ryan Homes and Welsh simply walked away from Tall Oaks but, instead, left due to a downturn in the economic state of the nation, this fact has no relevancy to the application of the Act. The clear facts of the case indicate that, at the time the purchase contracts were entered into,

---

5. "[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." *Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Group, Inc.,* 109 Ohio App.3d 312, 316 (12th Dist.), citing *Century 21 Am. Landmark, Inc. v. McIntyre*, 68 Ohio App.2d 126, 129-130 (1st Dist.1980).

well before the economic downturn, Ryan Homes made representations that recreational amenities would be constructed in Tall Oaks while contracting that it had an unlimited right to determine when, where, what, and *if* amenities would be provided.  Thus, regardless of the reason why Ryan Homes abandoned the subdivision, *at the time the contracts were entered into*, Ryan Homes had already violated 15 U.S.C. 1703(a)(2)(D).

{¶ 61} The majority's interpretation of 15 U.S.C. 1703(a)(2)(D) is too narrow a construction of the ILSA.  The majority is attempting to realign the current use and application of the Act with the original 1968 intent of Congress. It is true that the original intent of the ILSA was to be a shield for swindled purchasers who had "zero interest in owning uninhabitable swampland" rather than "remorseful purchasers of multi-million dollar condominiums" or homes in unfinished subdivisions.  Einav, *Read Between the Lines: Why Recent ILSA Litigation is Bad for Business and Contravenes Congressional Intent*, 33 Cardozo L. Rev. 2139, 2158-59 (June 2012).  However, case law dictates that the terms of the ILSA must "be applied liberally in favor of broad coverage" with exemptions being construed "narrowly, in order to further the statute's purpose of consumer protection." *Venezia,* 685 F. Supp. 2d at 756; *Pigott v. Sanibel Development, LLC*, 576 F.Supp.2d 1258, 1268 (S.D.Ala.2008); *N & C Properties v. Windham*, 582 So.2d 1044, 1048 (Ala.1991); *Olsen v. Lake Country, Inc.*, 955 F.2d 203, 205 (4th Cir.1991); *Nahigian v. Juno Loudoun, LLC*, 684 F.Supp.2d 731, 743 (E.D.Va.2010).

{¶ 62} Although it is clear that the application of the ILSA has strayed from the initial intent of Congress, it is not for the courts to redefine words (*i.e.*, stipulating) in order to realign the use of a statute with its 40-year-old intent.  Rather, it is up to Congress to alter the language of the ILSA if it desires that the Act be construed more narrowly.  Until that time, it is the realm of the judiciary to apply the Act as it is written.  *See* Einav, 33 Cardozo L. Rev. at 2164.

{¶ 63} In light of the foregoing, and based on the facts and circumstances of this case, as well as the overarching requirement to broadly construe the language of the ILSA, I disagree with the majority's finding that the "subject to change" portion of the purchase contracts satisfies 15 U.S.C. 1703(a)(2)(D) and entitles Ryan Homes to judgment as a matter of law. I would find that Ryan Homes is not entitled to judgment pursuant to 15 U.S.C. 1703(a)(2)(D) and, further, determine that no exemptions apply to Ryan Homes in this case.[6] I would then reverse and remand the case for proceedings on the issue of 15 U.S.C. 1703(a)(2)(D) only as to Ryan Homes. In the remaining aspects of the majority's opinion, I concur.

---

6. Ryan Homes argues that it is exempt from the ILSA under two sections, 15 U.S.C. 1702(a)(1) and (2). 15 U.S.C. 1702(a)(1) in not applicable, as Ryan Homes and Welsh were developers under a common promotional plan to develop 200 residential lots. 15 U.S.C. 1702(a)(2) is not applicable because Ryan Homes' obligation to complete construction of the homes in two years is made illusory by the purchase contract's limitation of the remedies the Homeowners can seek. *See Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849 (11th Cir.2009); *Samara Development Corp. v. Marlow*, 556 So.2d 1097 (Fla.1990); Guidelines for Exemptions under the Interstate Land Sales Full Disclosure Act, 49 Fed.Reg. 31375, 31376 (1984).